UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVIDSON & ASSOCIATES, INC., et al.,    )
                                        )
            Plaintiffs,                 )
                                        )
    v.                                  )          No. 4:02-CV-498 CAS
                                        )
INTERNET GATEWAY, et al.,               )
                                        )
            Defendants.                 )

## MEMORANDUM AND ORDER

This matter is before the Court on defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment. The Court will grant plaintiffs' motion to consider supplemental authority and defendants' motion to consider supplemental authority. The Court entered a consent decree on March 18, 2004 which resolved most of the claims raised in the summary judgment motions. On the remaining claims, the Court will (1) grant plaintiffs' motion for summary judgment as to Count VII of their second amended complaint for breach of contract and deny defendants' motion for declaratory judgment as to the contract claim; (2) grant plaintiffs' motion for summary judgment as to the anti-circumvention claim in Count II and will deny defendants' motion for declaratory judgment as to the anti-circumvention claim; and (3) grant plaintiffs' motion for summary judgment as to the trafficking in anti-circumvention technology claim in Count II and deny defendants' motion for declaratory judgment regarding the trafficking in anti-circumvention technology claim.

## I.  Procedural Background

Plaintiffs Davidson & Associates, Inc. d/b/a Blizzard Entertainment ("Blizzard") and Vivendi Universal Games, Inc. sued defendants Internet Gateway, Inc., Jim Jung, Ross Combs, Rob Crittenden, Yi Wang, and John Does 1-50. The Court dismissed Yi Wang and John Does 1-50. (See

Order of July 8, 2003).  Plaintiffs' second amended complaint alleges that defendants committed copyright infringement in violation of 17 U.S.C. § 501; circumvention of copyright protection systems and trafficking in circumvention technology under 17 U.S.C. § 1201(a); federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1); federal false designation of origin under the Lanham Act, 15 U.S.C. § 1125(c); common law trademark infringement and unfair competition; and breach of End User License Agreements ("EULA") and Battle.net Terms of Use ("TOU").  The defendants filed counterclaims requesting declaratory relief as to non-infringement under 17 U.S.C. § 501, non-circumvention of copyright under 17 U.S.C. § 1201(a), the unconstitutionality of 17 U.S.C. § 1201(a), and unenforceability of contract.

On March 18, 2004, the Court entered a consent decree and permanent injunction which constituted the full and complete relief on plaintiffs' claims of copyright infringement, federal trademark infringement, federal false designation, and common-law trademark and infringement.  The consent decree also provided complete relief on defendants' claim for declaratory judgment for non-infringement and unconstitutionality of 17 U.S.C. § 1201(a).  The consent decree resolves plaintiffs' claims in Counts I, III, IV, V, and VI of the second amended complaint.  The consent decree also constitutes the full monetary relief, costs, and fees related to this action.  The parties agreed that the remaining claims for injunctive relief (plaintiffs' claims of circumvention of copyright protection systems and trafficking in circumvention technology under 17 U.S.C. § 1201(a), breach of the EULAs and TOU, and defendants' claims for declaratory relief for non-circumvention and unenforceability of contract) should be resolved by the Court based on the parties' existing summary judgment motions.  The parties only seek injunctive relief on plaintiffs' remaining claims under Counts II and VII and defendants' claims for declaratory relief under Counts II and IV of their second amended counterclaim.

## II.  Legal Standard

This Court must grant summary judgment if, based upon the pleadings, admissions, depositions and affidavits, there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Board of Education, Island Trees v. Pico, 457 U.S. 853, 863 (1982).  "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."  Cearley v. General Am. Transp. Corp., 186 F.3d 887, 889 (8th Cir. 1999) (citing Crain v. Board of Police Comm'rs, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).  In this case, only legal issues exist for determination, as the parties submitted a joint stipulation of undisputed facts after entry of the consent decree.

## III.  Undisputed Facts

Blizzard is a California corporation.  Vivendi is the parent corporation of Blizzard.  The plaintiffs will be collectively referred to as Blizzard.  Blizzard creates and sells computer games that are played on personal computers.  The particular Blizzard games at issue in this case are entitled "StarCraft," "StarCraft: Brood War," "WarCraft II: Battle.net Edition," "Diablo," and "Diablo II: Lord of Destruction."  Blizzard games have sold millions of copies and generated revenue in excess of $480 million since 1998.

The individual defendants are two computer programmers, Ross Combs and Rob Crittenden, and a systems administrator, Jim Jung.  The corporate defendant Internet Gateway  is an Internet service provider based in St. Peters, Missouri.[1]  Jung is the president, co-owner, and day-to-day operator of Internet Gateway.

---

[1]The parties have included Internet Gateway in the term "defendants," but have not discussed its liability separate from the individual defendants.  The Court will do the same.

### A.  Battle.net Online Gaming Service

In January 1997, Blizzard officially launched Battle.net, a 24-hour online gaming service available to purchasers of its computer games.  The Battle.net service currently has nearly 12 million active users who spend more that 2.1 million hours online per day.  At any given time, Battle.net servers average about 200,000 concurrent users, with a peak volume of 400,000 concurrent users.

Blizzard has valid copyright registrations covering Battle.net and each of its computer games at issue in this litigation.  The only copyright registrations Blizzard has identified in this case concern its Battle.net server program and its individual computer game software.  The Battle.net service is a free service that allows owners of certain Blizzard games to play those games, through their personal computers, against each other by linking together over the Internet.  Battle.net mode allows users to create and join multi-player games that can be accessed across the Internet, to chat with other potential players, to record wins and losses and save advancements in a password protected individual game account, and to participate with others in tournament play featuring elimination rounds.  Players can set up private chat "channels" and private games on the Battle.net service to allow players to determine whom they wish to interact with on the Battle.net service.  These Battle.net mode features are accessed from within the games themselves.

In addition to multi-player play over the Internet via Battle.net mode, the games at issue have the capacity for and permit non-Internet multi-player gaming for a limited number of players who connect to each other via a local area computer network ("LAN") such as a home network, via modems connected to telephone lines, or by directly connecting two computers together with cables. The features and functions of Battle.net mode, however, cannot be accessed when players are connected through those means.  The parties stipulate that players also have the option of engaging in single player play against the computer.

Like most computer software, Blizzard games can be easily copied and distributed over the Internet. The Battle.net service is designed to prohibit access and use of Battle.net mode by such unauthorized or pirated copies of Blizzard games. Each time a customer logs onto the Battle.net service, a Battle.net server examines the customer's game to check whether the game is using the latest version of the game software. If a Blizzard game does not have the latest software upgrades and fixes, the Battle.net service updates the customer's game before allowing the game to play in Battle.net mode.

**B. Technology of the Battle.net Service**

Blizzard's games are shipped to customers on CD-ROM disks. Except for the game "Diablo," each authorized version of a Blizzard game comes with a "CD Key," a unique sequence of alphanumeric characters that is printed on a sticker attached to the case in which the CD-ROM was packaged. The user of the game must input the CD Key into his or her computer when installing the game, and it is subsequently stored on the computer for use in logging on to the Battle.net service. The Battle.net service prohibits use of unauthorized or pirated copies of Blizzard games with the Battle.net service.

To log on to the Battle.net service and access Battle.net mode, the game initiates a authentication sequence or "secret handshake" between the game and Battle.net server. First, the game and Battle.net server exchange random numbers (one provided by the game and one provided by the server). The game then takes the random numbers, as well as information from the CD Key, and calculates an encrypted alphanumeric sequence which is sent to the Battle.net server. The game performs this encryption to prevent individuals from stealing the game's CD Key when it is transmitted over the Internet to a Battle.net server. The Battle.net server receives the alphanumeric sequence sent by the game, along with other information sent by the game, and uses this data to determine whether

5

the CD Key information sent by the game is valid.  If the CD Key information is valid, the Battle.net server will determine whether the same CD Key is already being used by another game that is currently logged on to that Battle.net server gateway.[2]  If the CD Key is both valid and not currently being used by other players on the same Battle.net gateway, the Battle.net server sends a signal to the game that allows the game to enter the Battle.net mode and use the Battle.net gaming services.  The Blizzard game waits for this signal before entering Battle.net mode.  Battle.net uses an encryption algorithm for this process based on a common encryption algorithm.  The standard version of this algorithm was released by the United States government.

**C.  End User License Agreements ("EULA") and Battle.net Terms of Use ("TOU")**

In order to play the Blizzard game contained on a CD-ROM, a user must first install the game onto a computer from the CD-ROM.  First, the user inserts the CD-ROM into his or her computer.  A menu pops up automatically, and the user chooses to install the game from that menu.  Second, the user is presented with the terms of an End User License Agreement ("EULA").  At the end of the EULA, Blizzard includes a button with the text, "I Agree" in it, which the user must click in order to proceed with the installation.  The game will not work if the "I Agree" button is not selected.  Third, the user is asked to enter a name and the CD Key.  Fourth, the user is asked to choose where on his or her computer the program's files should be installed.  The files are then installed at the chosen location.  Finally, the user is offered the opportunity to register his or her copy of the game with Blizzard via an on-line registration process.  After the user has finished registering his copy, or if he or she chooses not to register, the installation process is complete.

---

[2]The parties stipulate that a gateway is a cluster of servers located in a particular geographic region and that the four current gateways are U.S. West, U.S. East, Europe, and Asia.

Blizzard's Battle.net service has a Terms of Use ("TOU"), which Blizzard presents to users when they first log onto the Battle.net service. First-time users of the Battle.net service are shown the terms of the Battle.net service TOU after a user has installed a Blizzard game and logs onto the Battle.net service for the first time to play with a purchased Blizzard game product. At the end of the TOU, Blizzard includes a button with the text, "Agree" in it, which the user must click before the Battle.net service can be used. The product will not work with the Battle.net service if the "Agree" button is not selected.

For every game at issue in this litigation except for Diablo, the outside packaging of the game states that use of the game is subject to a EULA, and that use of Blizzard's Battle.net service is subject to the Battle.net TOU. The terms of the EULAs and TOU themselves do not appear on the outside packaging. If the user does not agree to the terms of Blizzard's EULAs or Battle.net TOU, he or she may return the game for a full refund of the purchase price within thirty (30) days of the original purchase. The EULA contains the following language:

> YOU SHOULD CAREFULLY READ THE FOLLOWING END USER LICENSE AGREEMENT BEFORE INSTALLING THIS SOFTWARE PROGRAM. BY INSTALLING, COPYING, OR OTHERWISE USING THE SOFTWARE PROGRAM YOU AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, PROMPTLY RETURN THE UNUSED SOFTWARE PROGRAM TO THE PLACE OF PURCHASE OR CONTACT BLIZZARD ENTERTAINMENT CUSTOMER SERVICE . . . FOR A FULL REFUND OF THE PURCHASE PRICE WITHIN THIRTY DAYS OF THE ORIGINAL PURCHASE.

(Pls.' Ex. 8). The EULA further states "subject to the grant of license hereinabove, you may not, in whole or in part, copy, photocopy, reproduce, translate, reverse engineer[3], derive source code[4],

---

[3]"Reverse engineering is the process of discovering how an invention works by inspecting and studying it, especially by taking it apart in order to learn how it works and how to copy it and improve it." BLACK'S LAW DICTIONARY 1345 (8th ed. 2004).

modify, disassemble, decompile, create derivative works[5] based on the Program, or remove any proprietary notices or labels on the program without the prior consent, in writing, of Blizzard." Id. The EULA also states that it "shall have been deemed to have been made and executed in the State of California and any dispute arising hereunder shall be resolved in accordance with the law of California." Id.

The Battle.net TOU states: "Blizzard hereby grants, and by using Battle.net you thereby accept, a limited personal non-exclusive license and right to use Battle.net using either a home, work, or portable computer." Pls.' Ex. 9.

> You are entitled to use Battle.net for your own personal use, but you shall not be entitled to (i) sell or grant a security interest in or transfer reproductions of Battle.net to other parties in any way, nor to rent, lease, or license Battle.net to others without the prior written consent of Blizzard; (ii) copy, photocopy, reproduce, translate, reverse engineer, modify, disassemble, or de-compile in whole or in part any Battle.net software; (iii) create derivative works based on Battle.net; (iv) host or provide matchmaking services for any Blizzard software programs or emulate or redirect the communication protocols used by Blizzard as part of Battle.net, through protocol emulation, runneling, modifying, or adding components to the Program, use of a utility program, or any other technique now known or hereafter developed for any purpose, including, but not limited to, network play over the Internet, network play utilizing commercial or non-commercial gaming networks, or as part of content aggregation networks without the prior written consent of Blizzard or exploit Battle.net or any of its parts for any commercial purpose, including but not limited to, use at a location such as a cyber café, arcade, or other location where users are charged a fee, whether hourly or otherwise to use Battle.net; (v) use any third-party software to modify Battle.net to change game play, including, but not limited to cheats and/or hacks; (vi) use Blizzard's intellectual property rights contained in Battle.net to create or provide any other means through which Blizzard entertainment software products including,

---

[4]"The term "source code" means the [non-machine] language used by a computer programmer to create a program." BLACK'S LAW DICTIONARY 1429 (8th ed. 2004).

[5]"A 'derivative work' is a work based upon one or more preexisting works, such as a translation . . . abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship is a 'derivative work.'" 17 U.S.C. § 101.

but not limited to, StarCraft, StarCraft: Brood War, Diablo, Diablo II, Warcraft: Orcs & Humans, Warcraft II: Tides of Darkness, Warcraft II: Beyond the Dark Portal, Warcraft II: Battle.net Edition, and Warcraft II may be played by others, including, not limited to, server emulators . . . [t]his agreement shall be governed by and construed with the laws of the State of California, without giving effect to any principles of conflicts of laws.

Pls.' Ex. 9 ¶ 13.  Defendant Combs installed one Blizzard game, StarCraft, and clicked on the "I Agree" button after the EULA was displayed.  Defendant Crittenden installed Blizzard games and clicked on the "I Agree" button after the EULAs were displayed.  Defendant Jung installed three Blizzard games, Diablo, Diablo II, and Diablo II: Lord of Destruction, and clicked on the "I Agree" button after the EULAs were displayed.  Crittenden and Jung logged onto the Battle.net service and clicked on the "Agree" button after the TOUs were displayed.

**D. The bnetd project**

The users of the Battle.net service have occasionally experienced difficulties with the service. Blizzard has also received complaints about user profanity and users who cheated to win games by modifying Blizzard's software ("client hacks").  Although Blizzard has taken actions to correct these difficulties with its Battle.net service, including adding additional server capacity, banning cheaters, and providing for private channels and games, defendants were frustrated by the difficulties.

To address their frustrations with Battle.net, the defendants joined a group of non-profit volunteer game hobbyists, programmers, and other individuals called the "bnetd project."  Combs, Crittenden, and Jung were lead developers for the bnetd project.  Combs led all the developers.  The bnetd project was a collaboration focusing on development of the bnetd server, which is a program that attempts to emulate Blizzard's Battle.net service.  The bnetd server was created for "hack value[6]" and to address the difficulties that users sometimes experienced with the Battle.net service.  In

---

[6]The parties do not define "hack value."

addition, some or all of the defendants developed bnetd, in part, because they believed that Blizzard game players should not be forced to view advertisements displayed via the Battle.net service and that it was morally wrong for Blizzard to require people who want to play Blizzard's games over the Internet to agree to the Battle.net TOU or other restrictions imposed by Blizzard. The bnetd project is a volunteer effort and the project has always offered the bnetd program for free to anyone who wants a copy of it.

The bnetd project was organized and managed over the Internet through a website, available at www.bnetd.org, that was available to the public through equipment provided by defendant Internet Gateway. The bnetd emulator provides a server that would allow gamers unable or not wishing to connect to Battle.net to experience the multi-player features of Blizzard's games, and was designed to allow access to Blizzard games in a multi-player environment without using Battle.net. The bnetd emulator provides matchmaking services for users of Blizzard games who want to play those games in a multi-player environment without using Battle.net. The bnetd project attempted to include all of the user-visible features of the Battle.net service. The bnetd.org website provided online discussion forums and information about the bnetd program, and also provided access to the program's computer code for others to copy and modify.

The bnetd program was intended as a functional alternative to the Battle.net service. To serve this function, bnetd had to be compatible with Blizzard's software. In particular, compatibility required that bnetd speak the same protocol[7] that the Battle.net service speaks. This was necessary for compatibility because the Blizzard games expect servers to speak this protocol, and will therefore be unable to work with any server that does not speak the protocol. By speaking the same protocol, the

---

[7]Protocol is a set of rules for the format and sequencing of communication between two or more parties. Plaintiffs' and defendants' joint stipulation of undisputed facts ¶ 91.

bnetd program was able to interoperate with Blizzard games.  Once game play starts there is no difference between Battle.net and the bnetd emulator from the standpoint of a user who is actually playing the game.

Reverse engineering was necessary in order for the defendants to learn Blizzard's protocol language and to ensure that bnetd worked with Blizzard games.  It would not have been possible to create a workable bnetd server without reverse engineering Blizzard's software and protocols.  Combs used reverse engineering in the process of developing the bnetd server, including a program called "tcpdump" to log communications between Blizzard games and the Battle.net server.  Crittenden used reverse engineering in the process of developing the bnetd server, including using a program called "Nextray."  Crittenden also used a program called "ripper" to take Blizzard client files which were compiled together in one file and break them into their component parts.  Crittenden used the ripper program in order to figure out how Blizzard games displayed ad banners so that people running the bnetd emulator could display ad banners to users in the format that Blizzard uses on the Battle.net service.  Combs tried to disassemble a Blizzard game to figure out how to implement a feature that allowed bnetd to protect the password that a user enters when creating an account in Battle.net mode.  Crittenden made an unauthorized copy of a Blizzard game in order to test the interoperability of the bnetd server with multiple games.

Blizzard games are designed to connect only to Battle.net servers.  To cause a Blizzard game to connect to a bnetd server instead of a Battle.net server, the computer file that contains the Internet address of the Battle.net servers must be modified.  Combs participated in the development of a utility program called "BNS" to allow Blizzard games to connect to bnetd servers.  The BNS utility is part of the bnetd project.  Connecting to a bnetd server without the BNS utility program is more difficult to do and somewhat involved compared to using the BNS utility program.  Once the computer files

that contains the Internet address of the Battle.net servers has been modified so that the Blizzard game will connect to a bnetd server, the game sends the bnetd server information about its CD Key. It is technically possible for an individual who is using one of the Blizzard games at issue to play his or her game over the Internet via bnetd rather than Battle.net. Blizzard believes that the EULAs and TOUs prohibit this activity.

When the bnetd server receives the CD Key information, unlike Battle.net, it does not determine whether the CD Key is valid or currently in use by another player. The bnetd server computer code always sends the game an "okay" reply regardless of whether the CD Key is valid or currently in use by another player, as the game will otherwise not allow access to Battle.net mode. The bnetd emulator always allows the Blizzard games to access Battle.net mode features even if the user does not have a valid or unique CD Key, because the bnetd emulator does not determine whether the CD Key is valid or currently in use by another player. Blizzard does not disclose the methods it uses to generate CD Keys or to confirm the validity of CD Keys. Therefore, there is no way that defendants could have implemented a check for CD Key validity in the bnetd program. Defendants never advised people to play pirated copies of Blizzard games using the bnetd server.

The bnetd server program is highly configurable, which means that much of the operation of the server is under the control of the administrator running the server. Running a bnetd server allows users to become server administrators and not just players on someone else's server, giving them the ability to allow or deny access to various features of the bnetd server or to modify the computer code of the bnetd server. This allows the administrator of the bnetd server to create a gaming environment with different options than those presented to the user on the Battle.net service. In contrast, the Battle.net service is operated solely by Blizzard.

Combs, Crittenden, and Jung have used a Blizzard game to log into a bnetd server. Crittenden was aware that unauthorized versions of Blizzard games were played on bnetd servers. Jung knew that the bnetd emulator did not require that Blizzard games provide valid CD Keys. Combs suspected that the bnetd server would not know the difference between a real game and a pirated game.

### E. Distribution of the bnetd Server Program

Combs and Crittenden sent portions of the bnetd software to Jung to place on the www.bnetd.org website for download, or they put the software on the website themselves. Combs made the bnetd software available on his website located at www.cs.nmsu.edu/~rcombs/sc/. Defendants distributed the BNS utility program, which allowed Blizzard games to connect to bnetd servers. Also, defendants made the source code available as an "open source" application, meaning that others were free to copy the source code and distribute it with or without modifications. Because the bnetd source code was freely available, others developed additional Battle.net emulators based on the bnetd source code. Defendants also distributed binary versions of the bnetd program make it more convenient for users to set up and access the emulator program. Internet Gateway has donated space on its computers for use by the bnetd project. Internet Gateway also hosted a bnetd server that anyone on the Internet could access and use to play Blizzard games in Battle.net mode.

## IV.  Discussion

Copyright protection exists as a matter of federal law. The Copyright Act is constitutionally based in Article I, § 8 which states: "The Congress shall have power . . . [t]o promote the [p]rogress of [s]cience and other useful [a]rts, by securing for limited [t]imes to [a]uthors and [i]nventors the exclusive [r]ight to their respective writings and discoveries." States may not enact copyright protection that conflicts with federal law. "The Copyright Act must be construed in light of its basic

purpose of 'promoting broad public availability of literature, music, and other arts.'" <u>Twentieth Century Music Corp. v. Aiken</u>, 422 U.S. 151, 156 (1975).

### A. Preemption under the Copyright Act

Plaintiffs assert that the individual defendants[8] breached the EULAs and TOU when they used reverse engineering to learn Blizzard's protocol and distributed the bnetd software on the Internet. Defendants contend that the EULAs and TOU in this case concern areas protected by the Copyright Act. Defendants assert that the Copyright Act preempts the state law of contracts and therefore plaintiffs' state law contract claim is preempted by the Copyright Act.

"The clearest indication that federal law supplants state law is a statutory preemption provision. When Congress expressly codifies its preemptive intent in statutory form, our analysis 'begins with the language of the statute.'" <u>Jones v. Vilsack</u>, 272 F.3d 1030, 1034 (8th Cir. 2001) (citing <u>Lorillard Tobacco Co. v. Reilly</u>, 121 S. Ct. 2404, 2415 (2000)). There is a statutory preemption provision in the Copyright Act, 17 U.S.C. § 301(a) (2004), which provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title." <u>Id.</u> Section 301 preempts only those state law rights that "may infringe one of the exclusive rights provided by copyright law." <u>National Car Rental Sys. Inc. v. Computer Assocs. Int'l Inc.</u>, 991 F.2d 426, 431 (8th Cir. 1991). Section 301 also states that nothing in its title limits any rights or remedies under the common law or statutes of any state with respect to activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified under section 106. 17 U.S.C. § 301(b)(3).

First, the Court must determine if the computer software program is within the subject matter of copyright. <u>National</u>, 991 F.2d at 431. The answer is yes. 17 U.S.C. § 102. Then, the Court must

---

[8]Defendant Internet Gateway is not a party to the EULAs and TOU.

determine if the right sought under state law is equivalent to exclusive rights under federal copyright law. National, 991 F.2d at 431. If an extra element is required, instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright' and there is no preemption. Id.

In this contract claim, the plaintiffs are alleging that the contract creates a right not existing under copyright law, a right based upon defendants' agreement to the EULA and TOU with Blizzard. The Court agrees that the contractual restriction does create a right not existing under copyright law. The right created is the right to restrict the use of the software through the EULAs and TOU. "Absent the parties' agreement, this restriction would not exist. The contractual restriction on use of the programs constitutes an extra element that makes this cause of action qualitatively different from one for copyright." Id. at 433. Therefore, the Court finds that the EULA and TOU are not statutorily preempted by the Copyright Act.

**B. Choice of Law Provisions in Contract**

First, the parties dispute whether the contract should be governed by Missouri law or California law. In a case where federal jurisdiction is based on diversity of citizenship, the law of the forum state is applied when deciding choice of law issues. Inacom Corp. v. Sears, Roebuck and Co., 254 F.3d 683, 687 (8th Cir. 2001). Missouri courts generally recognize that parties may choose the state whose law will govern the interpretation of their contractual rights and duties. People's Bank v. Carter, 132 S.W.3d 302, 304 (Mo. Ct. App. 2004). Missouri courts will honor the parties' choice of law provision if the application of the law is not contrary to a fundamental policy of Missouri. Id. (citing Consol. Fin. Inv. v. Manion, 948 S.W.2d 222, 224 (Mo. Ct. App. 1997)).

In this case, the choice of law provision on the EULAs states, "This license Agreement shall be deemed to have been made and executed in the State of California and any dispute arising hereunder shall be resolved in accordance with the law of California." The TOU choice of law provision states, "This agreement shall be governed by and construed in accordance with the laws of the State of California, . . . ."

When a contract contains a choice of law provision, the validity of that provision is governed by § 187 of the Restatement (Second) of Conflict of Laws (1971), which provides:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
> (2) The law of the state chosen by the parties to govern their contractual rights and duties, will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> > (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> > (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

See In the Estate of Brown, 955 S.W.2d 940, 944-45 (Mo. Ct. App. 1997) (court finds that Missouri law follows the Restatement (Second) Conflict of Laws in contract actions and § 187 addresses choice of law where contract contains a choice of law provision).

The relevant inquiry is whether the issue involved here is one in which the parties could have resolved by mutual agreement. If so, the Court should honor the parties' choice of law. See Baxter Int'l Inc. v. Morris, 976 F.2d 1189, 1195-96 (8th Cir. 1992). The Court finds that the parties made an explicit agreement to the choice of law provision. Under Missouri law and the Restatement § 187(1), this Court will give effect to the reasonable expectations of the parties to the Agreement and apply the

law of the state chosen by the parties, California.  See Hospital Products, Inc. v. Sterile Design, Inc.,

734 F. Supp. 896, 899 n.2 (E.D. Mo. 1990) (court applies Missouri law where parties agreed that

Missouri law would govern interpretation of the agreement).

### C.  Existence of Contract

The parties disagree as to whether an enforceable contract exists.  Blizzard asserts that the

EULAs and TOU are enforceable contracts.  Defendants assert that the EULAs and TOU are not

contracts because under Missouri law there was no agreement between the parties.[9]  Defendants argue

that the only agreement between the parties is the offer to sell the software and the defendants'

acceptance by purchase of the software.  Also, defendants contend that the terms of the EULAs and

TOU were not presented at the time of purchase.  The defendants assert that if a contract exists, it is

unenforceable because it is unconscionable.

> The end user licenses at issue in this case are commonly referred to as "clickwrap" agreements.
>
> A "clickwrap" agreement appears when a user first installs computer software obtained from an online source or attempts to conduct an Internet transaction involving the agreement and purports to condition further access to the software or transaction on the user's consent to certain conditions there specified; the user consents to these conditions by clicking on a dialog box on the screen, which then proceeds with the remainder of the software installation or Internet transaction.

Kevin W. Grierson, Annotation, *Enforceability of "Clickwrap" or "Shrinkwrap" Agreements Common*

*in Computer Software, Hardware, and Internet Transactions*, 106 A.L.R 5th 309 n.1 (2003).[10]

---

[9]The Court notes that the defendants only addressed the applicability of Missouri law and did not address whether the EULAs and TOU were enforceable contracts under California law.

[10]Clickwrap licenses are similar to shrinkwrap licenses which "consist of written conditions on a card or paper sheet which appears when the user opens the packaged hardware or software" and "purports to condition use of the hardware or software on the user's implicit agreement to abide by the conditions specified thereon."   Kevin W. Grierson, *Enforceability of "Clickwrap" or "Shrinkwrap" Agreements Common in Computer Software, Hardware, and Internet Transactions*, 106 A.L.R. 5th 309 n.2.

The Court finds that the license agreements are enforceable contracts under both California and Missouri law. California courts have enforced end user license agreements, which are valid under California law. See Adobe Sys. Inc. v. One Stop Micro, Inc., 84 F.Supp.2d 1086, 1089-93 (N.D. Cal. 2000) (end user license agreement valid under California law); Hotmail Corp. v. Van$Money Pie, Inc., No. C-98-20064, 1998 WL 388389, at *6 (N.D. Cal. 1998) (applying California law, plaintiff likely to prevail on breach of contract claim regarding clickwrap agreement). Cf. Softman Prod. Co. v. Adobe Sys. Inc., 171 F.Supp.2d 1075, 1087-88 (C.D. Cal. 2001) (software reseller was not bound by EULA because it had never assented to the terms and court did not rule on validity of shrinkwrap agreements in general).

Even if Missouri law applied, the license agreement would be enforceable. Missouri has implemented the Uniform Commercial Code. The UCC provides that "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."[11] MO. REV. STAT. § 400.2-204(1) (2000). "An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." MO. REV. STAT. § 400.2-204(2) (2000). The defendants assert that the licenses are not enforceable because they add additional terms under Mo. Rev. Stat. § 400.2-207,

---

[11]The Court assumes, as have several other courts, that the games in question constitute goods under the UCC. See Specht v. Netscape Communications Corp., 306 F.3d 17, 29 n.13 (2nd Cir. 2002) (discusses problems with applying the UCC to licensing of software downloadable from the Internet under California law); I.Lan Systems, Inc. v. Netscout Serv. Level Corp., 183 F.Supp.2d 328, 332 (D. Mass. 2002) (court notes UCC does not technically apply to software licenses, but assumes that it does under Massachusetts law). In 1999, the National Conference of Commissioners on Uniform State Laws approved the Uniform Computer Information Transactions Act (UCITA), which would establish the enforceability of the EULA and TOU in this case. See UNIF. COMPUTER TRANSACTIONS ACT § 112 (2002). To date, the UCITA has only been adopted in Maryland and Virginia. It applies specifically to computer software license agreements. Adoption of the UCITA recognizes the difference between the copyrighted information contained in the physical object and the physical object itself.

which are to be construed as proposals for additions to the contract.  Defendants state that the EULAs and TOU are additional terms which they rejected.  Defendants contend that is unfair for them to pay $49.99 for the games and then be unable to install them or access Battle.net without assenting to the EULA and TOU.

The Court finds the EULAs and TOU are enforceable under the UCC.  First, the defendants did not purchase the Blizzard software, rather they purchased a license for the software.  A sale consists in the passing of title from the seller to the buyer.  Mo. Rev. Stat. § 400.2-106(1) (2000).  When defendants purchased the games, they bought a license to use the software, but did not buy the software.  Defendants' argument parallels the "first sale doctrine," although defendants do not use this term.

Under the first sale doctrine, "a sale of a lawfully made copy terminates a copyright holder's authority to interfere with subsequent sales or distribution of that particular copy."  Adobe Sys. Inc., 84 F.Supp.2d at 1089 (citations omitted).  "The first sale doctrine is only triggered by an actual sale.  Accordingly, a copyright owner does not forfeit his right of distribution by entering into a licensing agreement."  Id.  Section 117 of the Copyright Act provides that copies of computer programs may be "leased, sold, or otherwise transferred . . . only with the authorization of the copyright owner."  17 U.S.C. § 117(b).

> To apply the first sale doctrine and the exceptions of § 117, there must be an authorized transfer of ownership.  Either a licensee can never be the owner of a copy for purposes of § 117 or ownership of the licensed copy depends on the terms of the license agreement.  First, it must be determined what are the express terms of the contract?  When license terms provide that ownership of the copy remains in the copyright owner, they preclude the transfer of title to the copy of the license.

Raymond T. Nimmer, LAW OF COMPUTER TECHNOLOGY: RIGHTS LICENSES LIABILITIES § 7:69 (3d ed. 2003).  The EULAs and TOU in this case explicitly state that title and ownership of the games and

Battle.net remain with Blizzard.  Defendants do not produce sufficient evidence demonstrating that title and ownership of the games passed to them.  Therefore, the Court finds that the first sale doctrine is inapplicable here.

Defendants rely upon Klocek v. Gateway, Inc., 104 F.Supp.2d 1332 (D. Kan. 2000), to support their argument that Missouri law would not recognize their assent to the EULAs and TOU as binding contracts.  In Klocek, the court found that the shrinkwrap agreement was not enforceable under Missouri law.  The Court believes that this case is readily distinguishable from Klocek.  In Klocek, the parties disputed whether plaintiff's complaint about repair of his Gateway computer should be submitted to arbitration.  The contract was contained in a standard terms and conditions agreement and placed in the box with the Gateway computer.  The contract provided that if the customer kept the Gateway computer beyond five (5) days after delivery, the customer accepted the terms and conditions.  The court in Klocek held that a contract did not exist because "the act of keeping the computer past five days was not sufficient to demonstrate that Kloeck expressly agreed to the standard terms."  Id. at 1341.  Additionally, the mere fact that Gateway shipped the goods with the terms attached did not communicate to Klocek any willingness to proceed without Klocek's agreement to the standard terms.

In this case, the defendants do not dispute that (1) the software at issue in this litigation with the exception of Diablo has outside packaging stating it is subject to a EULA and Battle.net is subject to a TOU; (2) the defendants installed the games and assented to the EULA; (3) the defendants went to the Battle.net website and assented to the TOU; and (4) the EULA and TOU state it is a license and ownership of software remains with Blizzard.  This case is readily distinguishable from Klocek, because here the defendants had sufficient notice of the EULAs and TOU.  It is true that the terms of the EULAs and TOU were not on the box, but the terms were disclosed before installation of the

games and access to Battle.net was granted.  The defendants also expressly consented to the terms of the EULA and TOU by clicking "I Agree" and "Agree."  See Softman, 171 F.Supp.2d at 1087 ("Reading a notice on a box is not equivalent to the degree of assent that occurs when the software is loaded onto the computer and the consumer is asked to agree to the terms of the license.").  Unlike the plaintiff in Klocek, the defendants in this case are not being penalized for inaction, but instead are being held to contract terms to which they assented.  Accordingly, the Court finds that the EULA and TOU are enforceable contracts under both Missouri or California law.

### D.  Unconscionability

Next, the defendants argue that even if a contract was formed, it was a contract of adhesion and is therefore unenforceable.  Defendants argue that the contract is adhesive because it fails to square with the reasonable expectations of the parties, as no average member of the public would expect to pay $49.99 for a game and then be unable to use it when he or she gets home.  Defendants also argue that no reasonable person would expect to be barred from installing the game he just bought unless he or she is forced to comply with an EULA.[12]

California law allows courts to refuse to enforce an unconscionable provision in a contract. Cal. Code § 1670.5 (2004).  The purpose of § 1670.5 is to make it possible for the courts to police explicitly against the contracts or clauses which they find to be unconscionable.  Cal. Code § 1670.5 (2004) Legis. Comm. Cmt. (1).  The basic test for unconscionability is "whether, in light of the general background and the needs of a particular case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract."  Id. Unconscionability has both a procedural and substantive element.  Freeman v. Wal-mart Stores, Inc.,

---

[12]The defendants make their arguments under Missouri law, but the Court will consider the clickwrap license in accordance with applicable California law.

21

3 Cal. Rptr. 3d 860, 866 (Cal. Ct. App. 2003) (citations omitted).  The procedural element focuses on oppression or surprise due to unequal bargaining power, and substantive unconscionability focuses on overly harsh or one-sided results.  Id.  The prevailing view is that both procedural and substantive unconscionability must be present, although not to the same degree, before a court may exercise its discretion to refuse to enforce a contract or clause due to unconscionability.  Pardee Construction Co. v. Superior Court of San Diego County, 123 Cal. Rptr. 2d 288, 293 (Cal. Ct. App. 2002).  "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion the term is unenforceable, and vice versa." Freeman, 3 Cal. Rptr. 3d at 866-67.

> Procedural unconscionability concerns the manner in which the contract was negotiated and the circumstances of the parties at that time.  Procedural unconscionability focuses on factors of oppression and surprise.  The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party.  The second component of procedural unconscionability encompasses an aspect of surprise which the party supposedly agreed being hidden in a prolix printed form drafted by the party seeking to enforce them.

Pardee at 294.

The parties in this case did have unequal bargaining power because Blizzard is the sole seller of its software licenses; however, the defendants had the choice to select a different video game, to agree to the terms and gain the software and access to Battle.net, or to disagree and return the software for a full return of their money.  See De John v. TV Corp. Int'l, 245 F.Supp.2d 913, 919 (C.D. Ill. 2003).  Also, the defendants are not unwitting members of the general public as they claim. They are computer programmers and administrators familiar with the language used in the contract, and have the expertise to reverse engineer and understand source code.  Next, there was no surprise about the contract terms.  The defendants had notice that the games were subject to the EULAs and that access to Battle.net was subject to a TOU.  The defendants also had access for up to thirty days

22

to read over the EULA and decide if they wanted to adhere to its terms or return the games. Defendants had the same option in obtaining access to Battle.net.  Therefore, the Court finds that the licensing agreements were not procedurally unconscionable.

Even if the contract was procedurally unconscionable, it is not substantively unconscionable. "Substantive unconscionability focuses on the actual terms of the agreement." Pardee, 123 Cal. Rptr. 2d at 295.  It traditionally involves contract terms that are so one-sided as to "shock the conscience" or that impose harsh or oppressive terms.  Id.  The terms of the EULA and TOU in this case do not impose harsh or oppressive terms.  Therefore, the Court hold that the EULAs and TOU in this case are enforceable contracts.

**E.  Fair Use Defense**

The defendants claim that even if the EULA and TOU are enforceable under state law, they are unenforceable because they prohibit the fair use of the Blizzard software.  Section 107 of the Copyright Act states that "the fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching, scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  This section provides:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-- (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

Id.; See United Tel. Co. of Mo. v. Johnson Publ'g Co., 855 F.2d 604, 609-10 (8th Cir. 1988). Defendants argue that the EULAs and TOU are anti-competitive because they prohibit Blizzard's customers from hosting or providing matchmaking services for the game.  Also, the defendants state that the prohibition on reverse engineering violates their right under the fair use doctrine.  Plaintiffs

contend private contractual agreements waiving the right to reverse engineer are valid and defendants waived their rights in this case.

Reverse engineering as a fair use is firmly established. See Bowers v. Baystate Tech., Inc., 320 F.3d 1317, 1325 (Fed. Cir. 2003) (reverse engineering is a fair use under 17 U.S.C. § 107); Sony Computer Entm't, Inc. v. Connectix Corp., 203 F.3d 956, 602 (9th Cir. 2000) (reverse engineering was fair use for the purpose of gaining access to the unprotected elements of software).  The parties' dispute concerns the interpretation of two circuit court cases about the prohibition of reverse engineering under state law and licensing contracts.

In Vault Corp. v. Quaid Software, Ltd., 847 F.2d 255 (5th Cir. 1988), a software license agreement was declared invalid because the Louisiana License Act, with which the contract complied, was preempted by the federal Copyright Act.  The Fifth Circuit noted the conflicts between the Louisiana Act and the Copyright Act:  First, the Louisiana Act "authorize[d] a total prohibition on copying, [while] the Copyright Act allows archival copies and copies made as an essential step in the utilization of a computer program . . . ."  Id. at 269.  Second, the Louisiana Act "authorize[d] a perpetual bar against copying [and] the Copyright Act grants protection only for the life of the author plus fifty years . . . ."  Third, the Louisiana Act "place[d] no restrictions on programs which may be protected, but the Copyright Act only protects original works of authorship."  Id.  The court held that the provision of the Louisiana Act which "permits a software producer to prohibit the adaptation of a licensed computer program by decompilation or disassembly, conflicts with the rights of computer program owners under § 117 and clearly touches upon an area of federal copyright law."  Id. at 270.  The Fifth Circuit therefore concluded the restriction in Vault's license agreement against decompiliation or disassembly was unenforceable.  Id.

24

Defendants rely on <u>Vault</u> and assert that Blizzard's licensing restrictions on fair use by reverse engineering are identical to those in <u>Vault</u>. Defendants state that Blizzard is attempting to use state enforcement of private contracts in an area that touches upon federal copyright law. Plaintiffs rely on <u>Bowers</u> and assert that the <u>Vault</u> holding is limited because it holds only that a state law prohibiting all copying is preempted by the Copyright Act. Therefore, plaintiffs contend that <u>Vault</u> does not apply to private license agreements at issue in this case.

In <u>Bowers</u>, the court held that "private parties are free to contractually forego the limited ability to reverse engineer a software product under the exemptions of the Copyright Act." <u>Bowers</u>, 320 F.3d at 325-26 (applying First Circuit law). The <u>Bowers</u> court acknowledged the <u>Vault</u> holding, but distinguished it by stating there was no evidence that "the First Circuit would extend the concept to include private contractual agreements supported by mutual assent and consideration." <u>Bowers</u>, 320 F.3d at 1325. The Federal Circuit in <u>Bowers</u> stated that the First Circuit recognized the contractual waiver of affirmative defenses and statutory rights, therefore, the defendants could contractually waive their fair use right to reverse engineer. <u>Id.</u>

The Court finds the reasoning in <u>Bowers</u> persuasive. The defendants in this case waived their "fair use" right to reverse engineer by agreeing to the licensing agreement. Parties may waive their statutory rights under law in a contract. <u>See</u>, <u>e.g</u>, The Older Workers Benefit Protection Act, 29 U.S.C. § 626(f) (2004) (statute outlines minimum requirements for waiver of statutory right to sue under the ADEA). In this case, defendants gave up their fair use rights and must be bound by that waiver.

**F.  Copyright Misuse Defense**

Finally, defendants assert that the EULA and TOU terms constitute a misuse of Blizzard's copyright in the software. Defendants assert that by requiring restrictions on reverse engineering,

matchmaking, and commercialization, Blizzard is guilty of copyright misuse.  Further, defendants state that the EULA and TOU are facially anti-competitive.  Blizzard responds that the copyright misuse defense is unavailable as a defense to a contract claim.  Further, Blizzard asserts that even if the defense were available, Blizzard's software licenses contain routine restrictions repeatedly upheld by the courts and that defendants' unclean hands prevent them from relying upon the doctrine.

"Abuse of copyright is generally recognized as an equitable affirmative defense to a copyright infringement claim."  Schoolhouse, Inc. v. Anderson, No. 99-1214, 2001 WL 1640081 at *7 (D. Minn. 2001) (citing Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 973 (4th Cir. 1990)), aff'd 275 F.3d 726 (8th Cir. 2002).  In examining an assertion of copyright misuse, "the question is not whether the copyright is being used in a manner violative of antitrust law . . . but whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright."  Lasercomb, 911 F.2d at 978.  Misuse does not invalidate the copyright, it only precludes its enforcement during the period of misuse.  Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 342 F.3d 191, 204 (3rd Cir. 2003).

The leading cases affirming the availability of the copyright misuse defense have found that the language used in licensing agreements may constitute a misuse or abuse of copyright law.  See Lasercomb, 911 F.2d 970 (licensing agreement was copyright misuse because its broad language suppressed any attempt to independently implement the idea expressed, forbade licensee and its employees from developing or assisting in the development of any kind of computer-assisted die-making software; agreement term was for ninety-nine years, and all licensees and employees forewent utilization of creative abilities); Practice Mgmt. Info. Corp. v. American Medical Assoc., 121 F.3d 516, 520-21 (9th Cir. 1997) (licensing agreement constituted copyright misuse because the limitation imposed by the AMA prevented licensee from using other forms, giving the AMA a substantial and

unfair advantage over its competitors thus violating the public policy embodied in the grant of copyright); <u>Video Pipeline</u>, 342 F.3d at 204-05 ("Anti-competitive licensing agreements may conflict with the purpose behind a copyright's protection by depriving the public of a would-be competitor's creativity," but copyright misuse not found).

In the <u>Lasercomb</u>, <u>Practice Management</u>, and <u>Video Pipeline</u> cases, the defendants raised copyright misuse as a defense to copyright infringement claims.  In contrast, in this case defendants are asserting the copyright misuse doctrine as a defense to a contract claim, as plaintiffs' copyright infringement claim was settled by the parties and dismissed in the Consent Decree.  As a result, the copyright misuse defense may be inapplicable.  <u>See</u>, <u>e.g.</u>, <u>Pollstar v. Gigmania Ltd.</u>, 170 F.Supp.2d 974, 983 (E.D. Cal. 2000) (court declined to decide whether the license agreement terms constituted copyright misuse because the plaintiff did not allege copyright infringement).

In this case, the EULA's language permits the licensee to install one copy of the program on either a home or portable computer.  The program has a multi-player capability[13] that allows up to eight players per registered version.  These "spawned" versions may be installed on an unlimited number of computers, but must be played in conjunction with the registered version of the program from which they are spawned.  The license agreement is effective until terminated and may be terminated at any time by either party.  The licensee may also permanently transfer all of its rights under the license agreement if the recipient of the transfer agrees to the license agreement's terms and the licensee agrees to remove the program and any new materials from his or her computer.  These requirements are in addition to the requirements previously mentioned which prohibit reverse

---

[13]The EULA for StarCraft:  Brood of War does not state it has a multi-player format.  There is no EULA provided to the Court for the Diablo game.

engineering, creating derivative works, and transferring reproductions of the program among other restrictions.

Considering these factors, the Court finds that the EULAs and TOU terms do not constitute copyright misuse. The language used does not prevent defendants from competing with Blizzard by prohibiting them or their employees from developing video game software as in <u>Lasercomb</u>, or require defendants to use or buy only Blizzard games similar to the AMA's prohibition on use of a competitor's coding system in <u>Practice Management</u>. The parties can terminate the licenses at any time. Finally, the Court is reluctant to apply the copyright misuse defense as a defense to a contract claim, because the defense is normally used in copyright infringement actions and the copyright claim has been dismissed in this case. Therefore, the copyright misuse defense fails. As a result, the Court will grant plaintiffs' motion for summary judgment on Count VII of the second amended complaint and deny defendants' motion for summary judgment on this claim.

### G. Digital Millennium Copyright Act

The Digital Millennium Copyright Act of 1998 ("DMCA") implemented the Copyright Treaty and the Performances and Phonograms Treaty, "two international treaties signed before the World Intellectual Property Organization ("WIPO") in December 1996 by the United States and 125 other countries." 17 U.S.C. § 1201 (1998). "The two treaties supplement the Berne Convention for the Protection of Literary and Artistic Works, to account for the development of 'digital works and the growth of the Internet and other digital communication networks." Raymond T. Nimmer, LAW OF COMPUTER TECHNOLOGY: RIGHTS LICENSES LIABILITIES § 1:44 (3d ed. 2003). "Along with implementing the WIPO treaties, the [DMCA] addresses a variety of copyright issues, including the circumvention of copyright protection systems, the integrity of copyright management information, and civil remedies and criminal offenses and penalties with respect to copyright protection and

management systems." Amy P. Bunk, Annotation, *Validity Construction, and Application of Digital Millennium Copyright Act*, 179 A.L.R. Fed. 319 (1998).

### 1.  Circumvention of Copyright Protection Systems

Plaintiffs allege that defendants violated the anti-circumvention provision of the DMCA.  The DMCA provides, "No person shall circumvent a technological measure that effectively controls access to a work protected under this title."  17 U.S.C. § 1201(a)(1)(A).  To circumvent a technological measure "means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."  17 U.S.C. § 1201(3)(A).  The statute defines "effectively controls access to a work" to mean if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.  17 U.S.C. § 1201(3)(B).

Plaintiffs contend that the defendants' development of the bnetd emulator violates § 1201(a)(1)(A), because the defendants circumvented Blizzard's technological measures to gain access to Battle.net mode on their "unauthorized emulator."  Plaintiffs assert that all of the available defenses are inapplicable to defendants' conduct.

Defendants respond that even if they circumvented or provided tools for circumvention, § 1201(f) provides a complete defense to Blizzard's claims.  First, defendants assert that § 1201(f) provides a specific exception to the prohibition on circumvention outlined in § 1201(a) when the circumvention is done for the sole purpose of creating and distributing interoperable computer programs such as the bnetd matchmaking server.  Second, defendants state the legislative history

shows that the DMCA only protects initial access to copyrighted works, not subsequent access.[14]  See S. REP. NO. 105-190 at 28 (1998); H.R. REP. NO. 105-551, pt. 1, at 18 (1998).  Third, the defendants assert they had authority to access the Battle.net mode because they lawfully purchased the software.

Plaintiffs respond that the defendants did not circumvent technological measures for the sole purpose of identifying and analyzing elements of the program that are necessary to interoperate with computer programs.  Rather, plaintiffs allege that defendants' sole purpose was to copy and distribute Blizzard computer files.  Plaintiffs contend that the defendants not only copied code that would achieve interoperability, but also copied elements that would preserve player account information, display of icons, and presentation of ad banners.  Plaintiffs contend that the reverse engineering exemptions of § 1201(f) are inapplicable because defendants consented to a EULA and TOU that expressly gave up the right to reverse engineer and engage in matchmaking.  Next, plaintiffs state that the legislative history cited by defendants did not make it into the text of the statute and the plain language of the statute should prevail.  Finally, plaintiffs asset that the defendants did not have authority to access Battle.net mode via a fake Battle.net server.  Plaintiffs state that even if the defendants' theory were correct, the scope of the initial access was limited to connections with authentic Battle.net servers.  Plaintiffs assert that defendants' argument relies on the false assumption

---

[14] The Senate Report states: "Paragraph (a)(1) establishes a general prohibition against gaining unauthorized access to a work by circumventing a technological measure put in place by the copyright owner . . . .  This paragraph does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under title 17, even if such actions involve circumvention of other types of technological measures.  S. REP. NO. 105-190 at 28.  The House Report states: "Paragraph (a)(1) does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected, under Title 17, even if such actions involve circumvention of additional forms of technological protection measures.  In a fact situation, where the access is authorized, the traditional defenses to copyright infringement, including fair use, would be fully applicable.  So, an individual would not be able to circumvent in order to gain unauthorized access to a work, but would be able to do so in order to make fair use of a work which he or she has acquired lawfully.  H.R. REP. NO. 105-551, pt. 1 at 18.

that granting permission to access Battle.net mode via a Battle.net server creates implied authority to access Battle.net mode via a fake Battle.net server.

Section 1201(f)(1) provides a possible defense to plaintiffs' anti-circumvention claims. Section 1201(f)(1) provides:

> Notwithstanding the provisions of subsection (a)(1)(a), a person who has lawfully obtained the right to use a copy of a computer program may circumvent a technological measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs, and that have not previously been readily available to the person engaging in the circumvention, to the extent any such acts of identification and analysis do not constitute infringement under this title.

The DMCA defines interoperability as the "ability of computer programs to exchange information, and such programs mutually to use the information which has been exchanged." 17 U.S.C. § 1201(f)(4).

The Court finds that the defendants' actions constitute a circumvention of copyright under the DMCA. It is undisputed that defendants circumvented Blizzard's technological measure, the "secret handshake" between Blizzard games and Battle.net, that effectively controlled access to Battle.net mode. It is true the defendants lawfully obtained the right to use a copy of the computer programs when they agreed to the EULAs and TOU. The statute, however, only exempts those who obtained permission to circumvent the technological measure, not everyone who obtained permission to use the games and Battle.net. See Universal City Studios, Inc. v. Corley, 273 F.3d 429, 444 (2nd Cir. 2001) (court rejects argument that because DVD buyer has authority to view DVD, buyer has authority of copyright owner to view DVD in a competing platform; court finds that argument misreads § 1201(a)(3) because the provision exempts from liability those who would "decrypt"--not "use"-- an encrypted DVD with the authority of copyright owner). The defendants did not have the right to access Battle.net mode using the bnetd emulator. Therefore, defendants' access was without the authority of the copyright owner.

The primary question is whether the defenses under § 1201(f) are available to the defendants. It must be determined whether the defendants' sole purpose was to identify and analyze elements of the program to achieve interoperability of an independently created computer program with other programs, to the extent the identification and analysis did not constitute infringement under the Copyright Act. Plaintiffs contend that the defendants did not try to create another program, but rather their purpose was to copy Battle.net and place and distribute copies of it on the bnetd server to imitate Battle.net without the restrictions. The defendants admit that the bnetd project was to provide matchmaking services for users of Blizzard games who want to play in a multi-player environment without using Battle.net.

The Court finds that the defendants' actions constituted more than enabling interoperability. The bnetd emulator developed by the defendants always allows the Blizzard game to access Battle.net mode features even if the user does not have a valid or unique CD Key, because the bnetd emulator does not determine whether the CD Key is valid or currently in use by another player. Unauthorized copies of the Blizzard games were played on bnetd servers. Then, defendants distributed the bnetd program for free. Because the bnetd source code was freely available, others developed additional Battle.net emulators based on the bnetd source code. In addition, the defendants distributed binary versions of the bnetd program to make it more convenient for users to set up and access the emulator program. Finally, the defendants did not create an independently created computer program. The bnetd program was intended as a functional alternative to the Battle.net service. Once game play starts there are no differences between Battle.net and the bnetd emulator from the standpoint of a user who is actually playing the game. Based on these facts, defendants' actions extended into the realm of copyright infringement and they cannot assert the defenses under § 1201(f)(1). See 17 U.S.C. § 1201(f)(1). Therefore, the Court will grant summary judgment to Blizzard on Count II of its second

amended complaint as to the anti-circumvention claim and deny defendants' motion for summary judgment on this claim.

## 2.  Trafficking in Circumvention Technology

Finally, plaintiffs allege that defendants trafficked in circumvention devices in violation of 17 U.S.C. § 1201(a)(2).  Section 1201(a)(2) provides:

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that,-- (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to work protected under this title; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

The statute also states that "nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title."  17 U.S.C. § 1201(c).

Plaintiffs allege that the defendants' development and distribution of the bnetd emulator satisfies one, if not all, of the tests for liability.  First, the plaintiffs assert that the "secret handshake" that takes places between the Battle.net server and the Blizzard game is a technological measure that effectively controls access to Battle.net mode.  Second, plaintiffs claim that the only purpose of the bnetd emulator is to allow access to Battle.net mode.  Third, plaintiffs' claim that the defendants distributed the bnetd emulator knowing that it could be used to circumvent Blizzard's technological controls.

Defendants do not dispute these facts.  Again, defendants rely on the exceptions of § 1201(f).  Therefore, the question is whether the defendants' conduct meets the exceptions of § 1201(f).  The provisions applicable to § 1201(a)(2) in § 1201(f)(2)-(3)provide:

> Notwithstanding the provisions of subsections (a)(2) and (b), a person may develop and employ technological means to circumvent a technological measure, or to

circumvent protection afforded by a technological measure, in order to enable the identification and analysis under paragraph (1), or for the purpose of enabling interoperability or an independently created computer program with other programs, if such means are necessary to achieve such interoperability, to the extent that doing so does not constitute infringement under this title.

The information acquired through the acts permitted under paragraph (1), and the means permitted under paragraph (2), may be made available to others if the person referred to in paragraph (1) or (2), as the case may be, provides such information or means solely for the purpose of enabling interoperability of an independently created computer program with other programs, and to the extent that doing so does not constitute infringement under this title or violate applicable law other than this section.

17 U.S.C. § 1201(f)(2)-(3). The defendants assert that their purpose was to enable interoperability with the Blizzard software and that distribution to others for that same purpose is protected under § 1201(f).

Based on the facts presented to the Court, defendants violated the trafficking provision of § 1201(a)(2). The defendants' purpose in developing the bnetd server was to avoid the anti-circumvention restrictions of the game and to avoid the restricted access to Battle.net. Thus, the sole purpose of the bnetd emulator was not to enable interoperability. The bnetd emulator had limited commercial purpose because it was free and available to anyone who wanted to copy and use the program. See RealNetworks, Inc. v. Streambox, Inc., No. 99-CV02070, 2000 WL 127311 at *8 (W.D. Wash. 2000) ("portion of VCR that circumvents the Secret Handshake so as to avoid the Copy Switch has no significant commercial purpose other than to enable users to access and record protected content."). Finally, the development and distribution to others constituted copyright infringement and persons who commit copyright infringement cannot benefit from the exemptions of § 1201(f). See 17 U.S.C. § 1201(f)(2)-(3). "Sections 1201(f)(2) and (3) of the DMCA are not broad exceptions that can be employed to excuse any behavior that makes some device 'interoperable' with some other device." Lexmark Int'l Inc. v. Static Control Components, Inc., 253 F.Supp.2d 943, 970 (E.D. Ky. 2003). Therefore, the Court will grant plaintiffs' motion

for summary judgment as to Count II regarding the trafficking in anti-circumvention technology provisions and deny defendants' motion for summary judgment on this claim.

## V.  Conclusion

For the foregoing reasons, the Court finds that the individual defendants Jung, Crittenden, and Combs breached the license agreements in this case.  As a result, plaintiffs' motion for summary judgment should be granted on the breach of contract claim in Count VII and defendants' motion for summary judgment on this claim and Count IV of their counterclaim should be denied. Plaintiffs' motion for summary judgment on the anti-circumvention and trafficking in anti-circumvention technology claims in Count II should be granted and defendants' motion for summary judgment on Count II of the second amended complaint and Count IV of their counterclaim should be denied.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment is **DENIED**. [Doc. 109]

**IT IS FURTHER ORDERED** that defendants' supplemental opposition to plaintiffs' motion for partial summary judgment is **DENIED**.  [Doc. 142].

**IT IS FURTHER ORDERED** that plaintiffs' motion for partial summary judgment is **GRANTED**.  [Doc. 111]

**IT IS FURTHER ORDERED** that plaintiffs' motion to consider supplemental authority is **GRANTED**.  [Doc. 152]

**IT IS FURTHER ORDERED** that defendants' motion to consider supplemental authority is **GRANTED**.  [Doc. 160]

An appropriate judgment will accompany this memorandum and order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this <u>30th</u> day of September, 2004.